**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 24-CR-556 (TNM)** |
| **DERRICK T. MARTIN,** | |
| **Defendant.** | |

**GOVERNMENT'S OMNIBUS**
**OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS**

Defendant Martin moves to suppress statements he made on scene or during a custodial interview, ECF No. 24, an in-court identification of him by a law enforcement officer, ECF No. 25, and cellsite location data obtained with a warrant which assisted law enforcement in locating him, ECF No. 26. Mr. Martins' motions should be denied. *First*, the Government does not intend on offering any of Mr. Martin's statements during its case-in-chief, and therefore Mr. Martin's motion to suppress statements is moot. *Second*, the Supreme Court has indicated that in-court identifications are not subject to the same reliability screening as other types of identification procedures. Therefore, the request is improper. Even if the Court were to weigh the reliability of this identification procedure it would be admissible given the sufficient opportunity the officer had to observe Mr. Martin, his review of Mr. Martin's photograph prior to identifying Mr. Martin, and the fact that his identification of Mr. Martin was confirmed minutes later when Mr. Martin was arrested in his apartment. *Third*, the cellsite warrant sought by law enforcement was lawfully obtained. The cellsite warrant affidavit clearly established that the warrant sought location data to assist with an ongoing criminal investigation, locating Mr. Martin to arrest him on an outstanding extraditable warrant, was supported by probable cause, and satisfied the Fourth Amendment's particularization requirement.

For all of the following reasons, the Court should deny Mr. Martin's motions.

## BACKGROUND

On June 21, 2023, the Cecil County Maryland Sheriff's Office issued a warrant for Mr. Martin for failing to appear for trial in Case No. C-07-CR-22-000208, where Mr. Martin is alleged to have carried an illegal firearm while engaged in the distribution of narcotics. Law enforcement had been conducting an ongoing investigation into Mr. Martin for some time. As part of that investigation, law enforcement identified 1600 Pennsylvania Avenue SE, Apartment 402, in Washington, D.C., as an apartment where Mr. Martin was likely to be located.

Specifically, law enforcement conducted surveillance of Mr. Martin and the woman identified by the initials J.P. Based on this surveillance, law enforcement identified J.P. as Mr. Martin's girlfriend and determined that the two frequented the apartment complex at 1600 Pennsylvania Avenue Southeast, sometimes in the company of a minor child.

For example, on September 8, 2024, flight records reflect that Martin and J.P. had flown together from Miami to Ronald Reagan National Airport in Arlington, VA. Law enforcement conducted surveillance at the airport and observed Martin and J.P. leave the flight on which they were booked, walk to the parking lot, and enter a black 330i BMW sedan, with Maryland temporary registration T1929583. Later that same evening, that vehicle was observed parked in the rear of 1600 Pennsylvania Avenue Southeast, Washington, D.C. Martin and J.P. were observed walking out of the rear entrance of 1600 Pennsylvania Avenue Southeast in the direction of the black BMW.

On October 16, 2024, law enforcement observed the black BMW parked in the rear alley of 1600 Pennsylvania Avenue Southeast. At approximately 7:30 AM, J.P. and a minor child exited 1600 Pennsylvania Avenue Southeast and entered the black BMW. Later that day, law

enforcement observed Martin and J.P. walk out of the back door of the parking garage of 1600 Pennsylvania Avenue Southeast and enter the black BMW.

Law enforcement subpoenaed the management company for the apartment building located at 1600 Pennsylvania Avenue Southeast. Records reflected that J.P. was the listed lease holder for 1600 Pennsylvania Avenue Southeast, Apartment 402. J.P. was leasing Apartment 402 from January 17, 2024 through May 16, 2025.

On November 20, 2024, law enforcement applied for and obtained a warrant for historical and prospective location data, to include cell site location information, for a device utilizing a telephone number ending in 9321 (D.C. Superior Court 24-cswsld-4759, attached as Exhibit A). The warrant was served on the number's cellular service provider. This number was associated with Mr. Martin. Specifically, an individual was arrested in August 2024, and his phone was searched. In that phone were multiple messages from an individual who used Mr. Martin's known nickname with the telephone number ending in 9321. Additionally, law enforcement conducted searches of databases which aggregate criminal history, tax, utility, DMV, and other records. This database reflected that the 9321 number was associated with Mr. Martin.

Historical data received from the provider corroborated law enforcement's belief that Mr. Martin was residing at 1600 Pennsylvania Avenue Southeast, Apartment 402. In particular, an analysis of the historical data from the provider reflected that in November 2024 the device logged 2500 events with location information between the hours of 2:00 AM and 6:00 AM (the time period during which a person would likely be sleeping in his or her residence). Approximately 700 of the events are consistent with being in the area near 1600 Pennsylvania Ave SE. Additionally, of the top five most utilized cell towers in November 2024 (prior to the

execution of the arrest warrant), three were consistent with cell towers that service 1600 Pennsylvania Ave SE.

Prospective data returned from the provider on the morning of Mr. Martin's arrest indicated that at approximately 2:03 AM, the location of the device with the 9321 number was consistent with being near 1600 Pennsylvania Avenue Southeast, Apartment 402. The device was not registering any cellular connections with the provider's towers from 2:11 AM to 9:22 AM, consistent with the device's user sleeping. An analysis of the prospective ping data on the morning of Mr. Martin's arrest reflected that the device consistently utilized cell sites in the area of 1600 Pennsylvania Ave Southeast from 9:21 AM to approximately 11:00 AM (encompassing the time prior to and during the arrest).[1]

The above referenced location information regarding Mr. Martin was provided to members of the Metropolitan Police Department's (MPD's) Criminal Apprehension Unit (CAU). On November 25, 2024, at approximately 10:30 AM, members of the CAU responded to 1600 Pennsylvania Avenue Southeast to attempt to locate Mr. Martin.

### *Mr. Martin's Abandonment of His Backpack*

At approximately 10:37 AM on November 26, 2024, officers knocked and announced themselves at the door of Apartment 402 at 1600 Pennsylvania Avenue Southeast indicating that they had a warrant. Officers did not attempt to breach the door at that time.

---

[1] The Government provides this more detailed proffer of facts regarding Mr. Martin's association with 1600 Pennsylvania Avenue Southeast, Apartment 402, but anticipates that any witness at a suppression hearing would testify as to their more general understanding of these facts. In other words, the Government's witness will likely testify that he or she were aware that surveillance had placed Mr. Martin and his girlfriend at the apartment, records reflected that the apartment was leased by Mr. Martin's girlfriend, and cellsite location data placed Mr. Martin in the vicinity of the apartment the morning of his arrest.

At the same time, Sergeant Michael Smith was standing outside the apartment building on the street. At 10:39 AM, Sergeant Smith observed a man he recognized to be Mr. Martin open the window to the apartment and throw a black backpack out the window. Sergeant Smith's body-worn camera reflects the falling backpack at 10:39:16, though Mr. Martin is not clearly visible on camera. The backpack landed in the ground window wells pictured in the images below behind the black fencing.

*Figure 1*



*Figure 2*



While Sergeant Smith had not interacted with Mr. Martin prior to that day, he had familiarized himself with Martin's appearance by reviewing a recent MPD booking photograph of Mr. Martin which was distributed prior to the operation.

### *Mr. Martin's Arrest*

After Sergeant Smith saw Mr. Martin's backpack thrown from the window, MPD officers continued to knock on the apartment door. No one answered, but the officers could hear people moving inside the apartment. After waiting several minutes, at 10:43 AM, MPD officers used a master key provided by the apartment management company to open the apartment door. Once the door opened, a woman identified as Mr. Martin's girlfriend, J.P., attempted to slam the door closed, striking an officer in the process. J.P. refused multiple orders to vacate the apartment, repeatedly attempting to obtain her phone. She was moved into the hallway where she resisted the

officers' attempts to handcuff her.    As officers detained Mr. Martin's girlfriend, officers encountered Mr. Martin emerging from the living room of the apartment.    Mr. Martin initially refused lawful orders to place his hands up.    As officers attempted to handcuff him, he pulled away and flailed, causing Mr. Martin and one of the officers to fall to the ground.    He was ultimately secured.    The warrant for Mr. Martin issued by Cecil County was determined to be extraditable and he was placed under arrest.

### *The Protective Sweep of 1600 Pennsylvania Avenue SE, Apartment 402*

After Mr. Martin was secured, officers conducted a protective sweep of the apartment to ensure that no one else was present.    During their sweep they saw a black firearm in the bedroom located directly off the hallway where Mr. Martin was arrested.    The firearm was in plain view on the nightstand next to the bed.

*Figure 3*



*Figure 4*



Other than Mr. Martin and his girlfriend, the only other individual inside the apartment at the time officers secured it was a four-year-old child, whom Mr. Martin and his girlfriend identified as their child.

### The Recovery of Mr. Martin's Abandoned Backpack

Officers monitored the backpack that Mr. Martin had tossed out of the window while the arrest and protective sweep were occurring inside Apartment 402. After Mr. Martin was arrested, officers retrieved the backpack from the window well outside the building where it had landed. Inside were the following items:

1. Plastic mylar bag containing a white rock-like substance weighing approximately 700 grams with packaging;

2. Plastic bag containing numerous blue pills with "M30" stamped on them. The pills weighed approximately 628.4 grams with packa4ing; and

3. Micro Draco Firearm (PMD06069-18RO) loaded with one round in the chamber, and eleven rounds in an extended magazine.

*Figure 5*



*Figure 6*



*Figure 7*



*Figure 8*



The Micro Draco firearm recovered from Mr. Martin's abandoned backpack is the firearm for which Mr. Martin is currently charged.

Following Mr. Martin's arrest, law enforcement obtained an emergency search warrant for 1600 Pennsylvania Avenue SE, Apartment 402 (D.C. Superior Court 2024-cswsld-004818, attached as Exhibit B).  Officers searched the apartment and recovered the following:

- The previously observed Glock 19 with two serial numbers, loaded with one round in the chamber, and seventeen rounds in an extended magazine;

- Eleven rounds of 9mm ammunition; seven rounds of 10mm ammunition;

- Twenty-two rounds of 40mm ammunition;

- Thirty-one rounds of forty-five caliber ammunition;

- One round of 5.56 caliber ammunition;

- One round of 7.62 caliber ammunition;

- One 9mm magazine;

- Two 4mm magazine;

- Two 5.56 caliber magazines;

- One digital scale;

- Numerous additional blue pills stamped "M30;"

- Approximately 150 grams of a substance that field-tested positive for heroin;

- Approximately 7.5 grams of a substance that field-tested positive for cocaine;

- $12,133 in cash; and

- A cash counting machine.

Following his arrest, Mr. Martin was charged by Complaint on November 26, 2024, with one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1).  That same day, Mr. Martin was charged by complaint, in the Superior Court of the

District of Columbia, with being a fugitive from the state of Maryland in violation of 23 D.C. Code § 701. (D.C. Superior Court 2024 FUG 012015 Complaint and Affidavit in Support of an Arrest Warrant attached as Exhibit B).

Mr. Martin was subsequently indicted on one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1) on December 5, 2024. On March 18, 2025, Mr. Martin was charged by way of superseding indictment with one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1), one count of Unlawful Possession with Intent to Distribute 100 Grams or More of a Fentanyl Analogue, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vi), one count of Unlawful Possession with Intent to Distribute 500 Grams or More of Cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii)(II), and one count of Using, Carrying, and Possessing a Firearm During a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

## ARGUMENT

### I.    THERE IS NO BASIS TO SUPPRESS ANY IN-COURT IDENTIFICATION OF MR. MARTIN.[2]

Mr. Martin moves to suppress any in-court identification of him by MPD Sergeant Michael Smith, the officer who observed Mr. Martin at the window of his apartment and then observed Mr. Martin drop the backpack containing a firearm, carfentanil, and cocaine. Specifically, Mr. Martin argues that an in-court identification of Mr. Martin would be inherently suggestive, unreliable, and

---

[2] For the purposes of this motion, the Government assumes that Sergeant Smith will identify Mr. Martin at trial but cannot guarantee that or any other witness testimony.

therefore would violate the Due Process Clause.

As an initial matter, in-court identifications, unlike potentially suggestive pre-trial police identification procedures such as show-ups or confirmation photographs, are not subject to the same pre-trial screening for reliability. Instead, such identifications which are not the result of any improper police conduct are subject to the same guarantees of reliability as any other evidence: a trial with live witnesses and cross-examination in front of a jury. Even if this Court were to pre-screen this identification, however, the identification is reliable and should be admitted.

## A. PURSUANT TO *PERRY*, SERGEANT SMITH'S IN-COURT IDENTIFICATION IS NOT SUBJECT TO SCREENING.

Generally, in determining the admissibility of identification procedures, courts pre-screen the identification prior to trial by applying a two-prong test. *See United States v. Rattler*, 475 F.3d 408, 411 (D.C. Cir. 2007). "A court must determine first, whether the identification procedure 'was impermissibly suggestive.'" *Id.* (quoting *United States v. Washington*, 12 F.3d 1128, 1134 (D.C. Cir. 1994)). "[I]f so, [it must determine] second, whether, under the totality of the circumstances, the identification was sufficiently reliable to preclude 'a very substantial likelihood of irreparable misidentification.'" *Id.* (quoting *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977)).

While some courts have applied this pre-screening test to in-court identifications, following the Supreme Court's decision in *Perry v. New Hampshire*, most courts have found that it is not appropriate to do so. 565 U.S.C. 228 (2012). In *Perry*, a witness reported that a man was breaking into cars in the parking lot and identified that man by pointing out the kitchen window and stating that the man was standing in the parking lot next to a police officer. *Id* at 234. Notably, the identification was spontaneous and not arranged by law enforcement. *Id.* The witness was subsequently unable to identify the defendant in a photo array, but the prosecution admitted the

prior statement of identification at trial.  *Id.*  While *Perry* did not involve an in-court identification, the Court's decision suggests that in-court identifications should not be subject to this reliability analysis.

The Court explained that the identification in *Perry* should not be subject to pre-screening because it was not the result of improper law enforcement conduct.  *Id.* at 232-33.  As the Court held: "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." *Id.* at 248. The Court's prior decisions regarding the reliability of identification procedures "turn[ed] on the presence of state action and [were] aim[e]d to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array." *Id.* at 233.  In the absence of law enforcement misconduct, there is nothing to deter and therefore no pre-screening by the Court is necessary.  *Id.* at 237.  Instead, "[w]hen no improper law enforcement activity is involved, . . . it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at post-indictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt." *Id.*  The Court expressed concern that requiring pre-screening of all potentially suggestive identifications "would "involve trial courts, routinely, in preliminary examinations" because "[m]ost eyewitness identifications involve some element of suggestion. Indeed, *all in-court identifications do*." *Id.* at 244 (emphasis added).  For these reasons, the Court concluded that reliability pre-screening is only necessary when an identification has "the taint of improper state conduct."  *Id.* at 245.  And by referencing in-court identifications, the Court indicated that such identifications should not be subject to pre-screening.  *Id.* at 244.

Following *Perry*, "the clear majority of courts to consider the issue . . . have concluded that [the law] does not require trial courts to screen first-time in-court identifications for reliability." *Garner v. People*, 2019 CO 19, ¶ 27, 436 P.3d 1107, 1111 (Colo. 2019).

For example, in *United States v. Whatley*, the Eleventh Circuit found that *Perry* had abrogated the Circuit's previous decisions requiring reliability screening of in-court identifications and held that such in-court identifications were admissible because they were not the result of improper police conduct. 719 F.3d 1206, 1216 (11th Cir. 2013). And the Tenth Circuit did the same in *United States v. Thomas*, finding that its own prior precedent had been abrogated. 849 F.3d 906, 911 (10th Cir. 2017); *see also, e.g.*, *United States v. Hughes*, 562 F. App'x 393, 398 (6th Cir. 2014) (abrogating its prior decision because "the Supreme Court has recently made clear that due process rights of defendants identified in the courtroom under suggestive circumstances are generally met through the ordinary protections in trial."); *United States v. Shumpert*, 889 F.3d 488, 491 (8th Cir. 2018) (finding no plain error for a trial court not to conduct a reliability analysis of an in-court identification following *Perry*); *Benjamin v. Gipson*, 640 F. App'x 656, 659 (9th Cir. 2016) (rejecting ineffective assistance of counsel claim for failure to move to suppress first-time in-court identification because, given *Perry* motion likely to have been unsuccessful); *Young v. State*, 347 P.3d 395, 411-412 (Alaska 2016) (but announcing new, more protective due process test under state law); *Garner v. People*, 436 P.3d 1107, 1120 (Colo. 2019) (en banc); *State v. Doolin*, 942 N.W.2d 500, 511 (Iowa 2020); *Fairley v. Commonwealth*, 527 S.W.3d 792, 798-900 (Ky. 2017); *Galloway v. State*, 122 So.3d 614, 644 (Miss. 2013); *State v. Ramirez*, 409 P.3d 902, 911-13 (N.M. 2017); *State v. Hickman*, 355 Or. 715, 330 P.3d 551, 571-72 (Or. 2014); *Walker v.*

*Commonwealth*, 74 Va. App. 475, 502 (2022), *aff'd*, 302 Va. 304, 887 S.E.2d 544 (2023).[3]

Consistent with *Perry* and the clear majority of decisions in its wake, this Court should not require any pre-trial screening process for Sergeant Smith's in-court identification of Mr. Martin. Sergeant Smith's identification of Mr. Martin will not result from any improper law enforcement conduct. Mr. Martin will be seated in a well-lit courtroom at counsel table, in whatever clothing he chooses to wear. The Government will not lead or otherwise coach Sergeant Smith's identification. Identifications like this are routine and there is nothing improper about them.

Mr. Martin claims that an in-court identification procedure is improper and suggestive "because the government chose to bring Mr. Martin to trial and will be choosing to ask the officer for an identification at Mr. Martin's trial." ECF 25 at 4. But there was nothing improper about Mr. Martin's arrest on an outstanding warrant. Nor was there anything improper about charging Mr. Martin for the firearm and drugs he discarded. And Mr. Martin has a constitutional right to demand a trial on those charges, a right he has exercised here. Mr. Martin also has a right to attend his trial, and it is customary for him to sit next to his attorney during trial so that he can assist his attorney.

None of the steps which will result in Mr. Martin's presence at the trial and provide the Government with the ability to have its witnesses identify Mr. Martin, can be fairly described as

---

[3] A few courts have continued to endorse reliability pre-screening for in-court identifications. *See, e.g.*, *Lee v. Foster*, 750 F.3d 687, 691–92 (7th Cir. 2014); *United States v. Greene*, 704 F.3d 298, 305–06 (4th Cir. 2013); *United States v. Morgan*, 248 F.Supp.3d 208, 211–15 (D.D.C. 2017); *State v. Dickson*, 322 Conn. 410, 141 A.3d 810, 822–27 (2016); *City of Billings v. Nolan*, 385 Mont. 190, 383 P.3d 219, 224–25 (2016). Notably, two of these cases do not address *Perry*. *See Greene*, 704 F.3d 298, 305–06 (4th Cir. 2013); *City of Billings v. Nolan*, 385 Mont. 190, 383 P.3d 219, 224–25 (2016). One of the cases relies on Second, Third, and Fifth Circuit decisions that all predated *Perry*. See *Morgan*, 248 F. Supp. 3d at 213. And the Seventh Circuit decision, while citing *Perry*, did not engage in any analysis of its holding. *Lee*, 750 F.3d at 691.

improper law enforcement conduct. For this reason, courts have rejected these exact arguments in finding that no pre-trial screening is required for in-court identifications. *See, e.g.*, *United States v. Correa-Osorio*, 784 F.3d 11, 20 (1st Cir. 2015) ("But the government did not put him there. Also keep in mind that he had a constitutional right to be present at trial, . . . , and defendants (who have to sit somewhere, clearly) usually sit at counsel table to assist in their defense."); *Thomas*, 849 F.3d at 911 ("These circumstances, however, were not the product of improper conduct by law enforcement—be it by police officers or the prosecution.") *Whatley*, 719 F.3d at 1216 (same).

Mr. Martin argues that the Government could have obtained a pre-trial identification of Mr. Martin by conducting a lineup or using a photo array. But Mr. Martin has no right to demand a pre-trial identification and therefore the Government's decision not to employ those techniques is in no way improper. *See, e.g.*, *Thomas*, 849 F.3d at 911; *Whatley*, 719 F.3d at 1216.

Further, and as required by *Perry*, all the traditional guarantees of due process and reliability will be present at trial during the testimony of Sergeant Smith. 565 U.S. at 245-246. The jury will be able to observe Sergeant Smith as he testifies, judging his credibility, including the moment that he identifies Mr. Martin. The jury will be able to assess for themselves Sergeant Smith's explanation as to the circumstances under which he observed Mr. Martin in November 2024 and they will be front-row witnesses to how Sergeant Smith identifies Mr. Martin at trial. Defense counsel will be entitled to cross-examine Sergeant Smith and raise any appropriate concerns about the reliability of his identification. Indeed, defense counsel has already identified several areas of potential cross-examination. *See* ECF 25 at 5-6. And defense counsel will be entitled to argue both in opening and closing that Sergeant Smith's identification is unreliable.

These traditional guarantees of reliability are sufficient because there has been no improper law enforcement conduct in relation to this identification.

**B. SERGEANT SMITH'S IDENTIFICATION OF MR. MARTIN WILL BE RELIABLE.**

To the extent the Court finds that this in-court identification must be screened for reliability, the identification remains reliable and admissible.  As noted above, courts employ a two-prong test to determine the admissibility of identification procedures.  *First*, a court must determine if an identification procedure was impermissibly suggestive.  *See Rattler*, 475 F.3d at 411 (D.C. Cir. 2007).  *Second*, if the procedure was impermissibly suggestive, the Court must determine whether based on the totality of the circumstances, the identification remains reliable.  *Id.*  In determining reliability, courts consider "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation."  *Manson*, 432 U.S. at 114.

For the reasons set forth above, this in-court identification is not impermissibly suggestive.  It is a commonplace occurrence carried out by necessity where a defendant has exercised their constitutional right to a trial.  Even if the Court were to find that such an identification was impermissibly suggestive, however, it would remain reliable.

As an initial matter, Sergeant Smith had sufficient opportunity to observe Mr. Martin.  As reflected in *Figures 1* and *2*, Sergeant Smith was standing on the street immediately adjacent to the apartment building in which Mr. Martin was located.  The day was bright and clear.  According to Sergeant Smith, Mr. Martin appeared at the window of Mr. Martin's fourth-floor apartment.  Based on the body-worn camera images, this appears to be a height of approximately forty feet.  There were no trees or other obstructions between Sergeant Smith and the window in question.  Indeed, Sergeant Smith recalled being able to see Mr. Martin make a face of surprise or shock in

response to seeing police officers outside. After seeing Mr. Martin's face at the window, Sergeant Smith tracked Mr. Martin as he walked through the living room of the corner apartment and moved to the opposite corner, where Mr. Martin then dropped the backpack out of the window. Based on body-worn camera, which shows that Sergeant Smith moved from right to left consistent with his recollection of tracking Mr. Martin, Sergeant Smith's observations occurred over a period of approximately thirty seconds. While not the lengthiest observation period, this amount of time has been found to be sufficiently reliable. *See Sutton v. United States*, 434 F.2d 462, 473 (D.C. Cir. 1970) (finding a period of thirty seconds to one minute sufficiently reliable time to observe a suspect). In sum, Sergeant Smith had sufficient opportunity to observe Mr. Martin.

*Second*, Sergeant Smith's degree of attention confirms the reliability of this identification. Sergeant Smith was outside Mr. Martin's apartment for the specific purpose of identifying and arresting Mr. Martin. Sergeant Smith is part of a unit that solely engages in the arrest of fugitives and he has years of experience in that role. As is his routine, Sergeant Smith participated in a briefing prior to traveling to Mr. Martin's apartment in which the neighborhood, building, and Mr. Martin were discussed at length. Prior to traveling to the apartment, Sergeant Smith reviewed a recent photograph of Mr. Martin specifically so he could identify him on scene. Once on scene, Sergeant Smith was alert: it was his job to be. Unlike a witness who just happens to be on the scene of an offense, Sergeant Smith was there to identify Mr. Martin. And Sergeant Smith's alertness was reflected in his observation of Mr. Martin at the window, followed by him tracking Mr. Martin.

*Third*, Sergeant Smith's identification of Mr. Martin is indisputably accurate. Sergeant Smith observed Mr. Martin in the apartment in which Mr. Martin, just minutes later, was found. There were no other men in that apartment. And law enforcement was at the front door, so no

19

other men could have escaped the apartment.  The only other occupants were a young child and J.P.  Sergeant Smith's observation of Mr. Martin was confirmed with one-hundred percent accuracy just minutes after he made that observation.

Finally, the time between the observation (November 25, 2024) and the trial testimony (May 27, 2025), is of sufficiently short duration to render this identification reliable. Approximately six months will have lapsed between Sergeant Smith's initial identification and his trial testimony.  Far longer periods of time have been found to be sufficiently short to render an identification reliable.  *See, e.g.*, *United States v. Miller*, 795 F.3d 619, 629 (7th Cir. 2015) (finding no due process violation in identification 18 months after incident, despite failure to identify defendant during pretrial procedure); *Lee*, 750 F.3d at 692 (finding identification reliable nine months after the incident, despite failure to identify defendant in pretrial photo array).[4]

In sum, Sergeant Smith's in-court identification of Mr. Martin will be reliable and should be admitted.

## II.    THE CELLSITE WARRANT WAS VALID AND APPROPRIATELY USED TO LOCATE MR. MARTIN GIVEN HIS FUGITIVE STATUS.[5]

Mr. Martin also moves to suppress all information collected as the result of a cellsite search warrant that was obtained by law enforcement for the purpose of locating and arresting Mr. Martin on an outstanding extraditable warrant.  *See* ECF No. 26.  Mr. Martin contends that the cellsite

---

[4] The fourth factor, the witness' certainty at the time of confrontation, will only be determined at trial.

[5] Mr. Martin further asserts the search and seizure of his cellsite location information violated his rights under the Fourth Amendment.  In support of this argument, Mr. Martin cites to Supreme Court decisions all of which involved warrantless searches.  ECF No. 26 at 3-4.  These decisions are inapposite, where, as here, law enforcement obtained a warrant authorizing the search of cellsite location information associated with Mr. Martin's phone number.

warrant was obtained unlawfully, failed to establish probable cause for the information sought, and was insufficiently particularized. Each of these arguments are incorrect as a matter of law.

The cellsite warrant satisfied the dictates of 18 U.S.C §§ 2703 and 3123 because the affidavit clearly set forth that the warrant sought location data to assist law enforcement with an ongoing criminal investigation: locating Mr. Martin to arrest him on an outstanding extraditable warrant. The warrant was supported by probable cause because the affidavit established that the warrant was sought for the purpose of locating a fugitive from justice, an arrestable offense under the D.C. Code. *See* 23 D.C. Code § 701. And the warrant satisfied the Fourth Amendment's particularization requirement as it was narrowly tailored as to the information sought: historical and prospective cellsite location information necessary for law enforcement to locate Mr. Martin. Accordingly, the defendant's motion to suppress all information collected as the result of a cellsite search warrant (ECF No. 26) should be denied.

### A. THE CELLSITE WARRANT WAS LAWFULLY ISSUED PURSUANT TO 18 U.S.C. §§ 2703, 3123.

Pursuant to 18 U.S.C. §§ 2703 and 3123, a court may order the disclosure of contents of wire or electronic communications in electronic storage, or issue an order authorizing the installation and use of a pen register or trap and trace device, respectively, where the government puts forth facts showing there are reasonable grounds to believe that the information sought is relevant and material to an ongoing criminal investigation. The cellsite warrant here was sought by law enforcement for that exact purpose, to obtain information relevant to locating a fugitive from justice.

Mr. Martin contends that the cellsite warrant obtained by members of the Metropolitan Police Department to locate and arrest him on a fugitive warrant did not relate to an ongoing

criminal investigation. This argument is simply incorrect. The cellsite warrant clearly stated on its face that it sought electronic information associated with Mr. Martin's phone number "which is evidence of a violation of D.C. Code/location of a fugitive" [sic]. And the accompanying affidavit made clear that officers were seeking the requested information because of Mr. Martin's outstanding extraditable warrant from Maryland. Locating a fugitive from justice who has an outstanding arrest warrant is clearly related to a criminal investigation. Accordingly, there is no question that the cellsite warrant sought information—specifically, information that would assist law enforcement with locating Mr. Martin—that was relevant and material to an ongoing criminal investigation.

Next, Mr. Martin asserts that no provision of the D.C. Code formed the basis for the warrant sought by Mr. Martin. That argument must also fail. 23 D.C. Code § 701 provides that "any judge of the Superior Court [of the District of Columbia] may, upon complaint on oath or affirmation of any credible witness, setting forth the offense, that the person is a fugitive from justice . . . issue a warrant to bring the person so charged before the Superior Court, to answer the complaint." And that is exactly what law enforcement did here. On November 26, 2024, the day after Mr. Martin's arrest by police, a complaint was submitted, and a warrant issued, in the Superior Court of the District of Columbia charging Mr. Martin with being a Fugitive from Justice. (*See* Complaint and Affidavit, Case No. 2024 FUG 012015, attached as Exhibit B). Put simply, MPD lawfully obtained the warrant for Mr. Martin's historical and prospective cell site data. Therefore, Mr. Martin's motion to suppress the information obtained from the warrant should be denied.

## B. THE CELLSITE WARRANT CLEARLY ESTABLISHED PROBABLE CAUSE FOR THE REQUESTED INFORMATION.

"[T]he task of evaluating probable cause [is] 'a practical, common-sense decision whether,

given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found[.]" *United States v. Cardoza*, 713 F.3d 656, 659 (D.C. Cir. 2013). This is an "objective standard" that is informed by a "totality of the circumstances analysis." *United States v. Burnett*, 827 F.3d 1108, 1114 (D.C. Cir. 2016). "In the context of a search warrant application, the probable cause inquiry focuses on whether the application provides a substantial basis for concluding that a search would uncover evidence of wrongdoing by demonstrating cause to believe that evidence is likely to be found at the place to be searched and a nexus between the item to be seized and criminal behavior." *Matter of Search of Info. Associated with Cellular Tel. Towers*, 616 F. Supp. 3d 1, 9 (D.D.C. 2022) (internal citations omitted).

The search warrant here met this standard. The warrant established a clear nexus between the cellsite location information sought and the criminal activity at issue, locating a fugitive from justice. The nature, timing, and location of Mr. Martin's whereabouts were crucial evidence for the law enforcement officers who were seeking to locate and apprehend Mr. Martin on an extraditable warrant from Maryland. Accordingly, the warrant established probable cause for the requested historical and prospective cell site information.

### C. THE CELLSITE WARRANT WAS SUFFICIENTLY PARTICULARIZED.

"An application for a search warrant must 'particularly describe[e]' the scope and objection of the proposed search and seizure." *Matter of Search of Info. Associated with Cellular Tel. Towers*, 616 F. Supp. 3d at 10. In the context of searches of electronic data, a warrant "is sufficiently particular if its scope is limited to evidence pertaining to a specific crime." *United States v. Smith*, Case No. 19-CR-324 (BAH), 2021 WL 2982144 at *8 (D.D.C. July 15, 2021).

"As the proper scope of a warrant is confined to the breath of the probable cause that supports it, the requirement of particularity is closely tied to the requirement of probable cause." *Id.*

Here, the cellsite warrant submitted by MPD was sufficiently particularized as to the information pertinent to the probable cause showing.  Mr. Martin does not explain why the prospective cell site warrant was overbroad, nor can he.  That is because this warrant was exclusively focused on historical and prospective cell site information for a phone number associated with Mr. Martin.  Information that the MPD officers needed to determine a pattern of life for Mr. Martin and locate his present whereabouts in order to apprehend him.  *See* Exhibit A at 9, n.1.  The historical information sought by the warrant was appropriately cabined to the period from November 1, 2024, through November 20, 2024, and the prospective information sought was limited to a period of 30 days.  *See* Exhibit A at 10-12.  Accordingly, the warrant was "sufficiently particularized to provide specific guidance to law enforcement as to what data may be seized and a 'fair probability' that evidence of the alleged crime will be discovered through execution of the warrant[]."  *Matter of Search of Info. Associated with Cellular Tel. Towers*, 616 F. Supp. 3d at 12.

### D.  EVEN IF THE WARRANT FAILED TO ESTABLISH PROBABLE CAUSE, SUPPRESSION IS NOT WARRANTED BECAUSE ANY VIOLATION WAS NOT THE RESULT OF INTENTIONAL POLICE MISCONDUCT.

The exclusionary rule's "sole purpose" is to deter future Fourth Amendment violations. *(Willie Gene) Davis v. United States*, 564 U.S. 229, 236-37 (2011); *see also United States v. Calandra*, 414 U.S. 338, 347 (1974) (noting that the "prime purpose" is to deter future unlawful police conduct); *United States v. Leon*, 468 U.S. 897, 906 (1984) ("The [exclusionary] rule thus operates as a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."). The deterrent value of exclusion directly corresponds to the "culpability of the law enforcement

conduct" in committing the violation. *Herring v. United States*, 555 U.S. 135, 143 (2009). "When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong." *(Willie Gene) Davis*, 564 U.S. at 238. However, where the law enforcement action was pursued in good faith, as it was here, the deterrence rationale loses much of its force. *Leon*, 468 U.S. at 919.

To trigger the exclusionary rule, law enforcement conduct "must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144 (noting that the Court has never suggested that evidence should be excluded in circumstances where it might provide marginal deterrence). The Supreme Court has held that merely negligent law enforcement conduct does not justify exclusion when balancing the benefits of deterrence with the systemic cost of excluding otherwise credible evidence and the possibility of letting guilty and dangerous defendants go free. *See Id.* at 141 – 47 (holding that when a constitutional violation was caused by an officer's negligent error or good faith mistake, rather than systemic error or reckless disregard of constitutional requirements, the costs of suppressing evidence necessarily outweigh the benefits); *see also Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 364-65 (1998) ("[The exclusionary rule's] costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application."). Error that results from negligence or mistake, is not enough, by itself, to require the "extreme sanction of exclusion." *Herring*, 555 U.S. at 140 (quoting *Leon*, 468 U.S. at 916). In such a case, "the criminal should not go free because the constable has blundered." *Herring*, 555 U.S. at 148 (drawing a distinction between mistakes versus systematic error or reckless disregard for constitutional requirements).

"In deciding whether exclusion is appropriate, an assessment of the flagrancy of the police

misconduct constitutes an important step in the calculus." *Leon*, 468 U.S. at 911. Evidence should only be suppressed where "the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Illinois v. Krull*, 480 U.S. 340, 348-49 (1987) (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975)). As such, the exclusionary rule should not be applied for the purpose of deterring "reasonable law enforcement activity." *Leon*, 468 U.S. at 919 (further explaining that courts have considerable discretion in deciding what is reasonable based upon the circumstances of particular cases). Exclusion has "always been our last resort, not our first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). "'[E]vidence seized in reasonable, good-faith reliance on a search warrant' need not be excluded, even if the warrant turns out to have been unsupported by probable cause" or otherwise invalid. *United States v. Griffith*, 867 F.3d 1265, 1278 (D.C. Cir. 2017) (quoting *Leon*, 468 U.S. at 905).

Even where there are technical violations of a warrant, where law enforcement conduct is reasonable, evidence will not be suppressed. *See, e.g., Squillacote*, 221 F.3d at 557 ("Under these circumstances, even if the FBI's actions amounted to technical violations of the terms of the warrant, the violations were relatively minor and were motivated by considerations of practicality rather than by a desire to engage in indiscriminate fishing."); *Gerber*, 994 F.2d at 1561 (holding that evidence should not be suppressed due to an inadvertent, rather than intentional, failure to conform with Rule 41 when agents made a second entry on the warrant two days after it had expired); *United States v. Twenty–Two Thousand, Two Hundred Eighty Seven Dollars ($22,287.00) United States Currency,* 709 F.2d 442, 449 (6th Cir. 1983) (denying suppression of evidence seized the day after the warrant expired, deeming the infraction "de minimis" because a reasonable basis existed and there was no "intentional or deliberate" disregard of the Rule 41 requirements); *In re Motion to*

*Quash Grand Jury Subpoenas,* 593 F. Supp. 184, 192 (S.D.W.Va. 1984) (finding suppression inappropriate where agents, who initially could not gain access to the premises and failed to realize that the warrant expired the same day it was issued, executed the warrant four days after its expiration, because nothing occurred in the interim to obviate the magistrate's finding of probable cause and because the agents acted in good faith).

Here, the officers who relied on the information provided by the historical and prospective cell site warrant to effectuate Mr. Martin's arrest did nothing to exhibit deliberate, reckless, or grossly negligent disregard for the defendant's Fourth Amendment rights.  The officers who arrested Mr. Martin relied, in good faith, on information that was obtained using a warrant that they had every reason to believe had been obtained lawfully.  In short, there is no justification for the exclusion of the information obtained as a result of the warrant.

<u>**CONCLUSION**</u>

For the foregoing reasons, this Court should deny Mr. Martin's pretrial motions.

Respectfully submitted,

EDWARD R. MARTIN
UNITED STATES ATTORNEY
D.C. Bar No. 481866

/s/ Cameron A. Tepfer
Cameron A. Tepfer
D.C. Bar No. 1660476
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
202-258-3515
Cameron.Tepfer@usdoj.gov

/s/ Benjamin Helfand
Benjamin Helfand
D.C. Bar No. 1658708
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
202-252-7059
Benjamin.Helfand@usdoj.gov