**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**DERRICK THOMAS MARTIN**,<br><br>Defendant. | Case No. 1:24-cr-00556 (TNM) |

**MEMORANDUM ORDER**

After a five-day trial, a federal jury convicted Derrick Martin of four gun and drug crimes.  Before sentencing, the Government disclosed that it had failed to turn over impeachment evidence against one of its witnesses, Metropolitan Police Officer Thomas Schemmel.  Martin now moves for a new trial, asserting that the Government violated *Brady v. Maryland*, 373 U.S. 83 (1963).

The Court disagrees.  A *Brady* claim can succeed only if the suppressed evidence was material to the outcome of the trial.  But Officer Schemmel was a minor witness, and his testimony was largely corroborated by another officer.  Most of the overwhelming evidence against Martin bore no relation to Officer Schemmel.  The Court sees no reasonable probability that the trial's outcome would have been different had the Government disclosed the impeachment evidence against Officer Schemmel.  A new trial thus is unwarranted.

**I.**

In March 2025, a grand jury indicted Derrick Martin on four counts: (1) Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1); (2) Unlawful Possession with Intent to Distribute 100 Grams or More of a Fentanyl Analogue, in

violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(vi); (3) Unlawful Possession with Intent to Distribute 100 Grams or More of Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii)(II); and (4) Possession of a Firearm During a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c)(1)(A)(i).  Superseding Indictment, ECF No. 19, at 1–3.  The case went to trial the following year.  *See* Min. Entry 3/10/2026.

### A.

During the five-day trial, the Government called 13 witnesses.  *See* Gov't Ex. List, ECF No. 94, at 1–12.  Before addressing Officer Schemmel, the Court recaps each day's testimony from the other witnesses.

Day One

The Government's case opened with Metropolitan Police Officer Michael King.  Mar. 10 Trial Tr., ECF No. 111, at 182:4–7.  Officer King testified that on November 25, 2024, he responded to an apartment in Southeast Washington, D.C., to help execute an unrelated arrest warrant for Martin.  *Id.* at 189:20–24.  After knocking on the apartment door but before entering, Officer King received a radio transmission from Metropolitan Police Sergeant Michael Smith stating that he "observed [Martin] in the window."  *Id.* at 198:6–12.  Officer King then entered the apartment, where he encountered Martin, his girlfriend Juanneshia Payne, and their young child.  *Id.* at 200:9–203:23.  Officer King detained Martin and recovered Martin's phone.  *Id.* at 203:24–209:11.  He later seized blue M30 carfentanil pills and cocaine from a backpack that someone had dropped from the apartment window.  *Id.* at 215:2–221:19.

Day Two

Sergeant Smith was next.  Mar. 11 Trial Tr., ECF No. 112, at 19:17–20.  He helped execute the arrest warrant for Martin, *id.* at 21:16–22:1, whom he identified in court, *id.* at 22:2–

10.  Sergeant Smith's role was to secure the apartment building from the outside.  *Id.* at 24:11–12.  While looking up at the apartment building, he "saw [Martin] at the window looking out at [him]."  *Id.* at 24:12–14.  According to Sergeant Smith, Martin looked "surprised" to see him standing outside the apartment building.  *Id.* at 37:19–20.  Martin then "went back away from the window," and Sergeant Smith "saw a silhouette from where [he] saw [Martin] in the beginning start to walk towards the left of the apartment."  *Id.* at 38:1–6.  That silhouette had "the same body structure, same height, [and] same build" as Martin.  *Id.* at 38:4–39:7.  Sergeant Smith then "saw a hand protrude through the window and then drop" a backpack.  *Id.* at 40:3–6.  The hand emerged from a window towards which Martin's shadow had moved.  *Id.* at 40:3–41:17.

Next up was Danielle Yandura from the D.C. Department of Forensic Sciences.  *Id.* at 124:23–125:2.  She too responded to the apartment.  *Id.* at 126:14–20.  Ms. Yandura recovered the backpack dropped from the apartment window, which aside from the narcotics also contained a firearm and magazine.  *Id.* at 130:18–131:23.  She identified the firearm and magazine that the Government presented to her as the ones she "had collected on scene."  *Id.* at 134:6–15.  The parties stipulated that law enforcement had recovered a Micro Draco firearm and various ammunition at the scene.  *Id.* at 221:19–25.

After Ms. Yandura, the Government called Metropolitan Police Officer Robert McCollum, *id.* at 162:11–14, who testified to swabbing the recovered Micro Draco and magazine for DNA, *id.* at 164:6–168:20.  Officer McCollum's testimony was followed by that of Ryan Mathews from the Department of Forensic Sciences.  *Id.* at 182:16–18.  Mr. Mathews also responded to the apartment, where he took photographs.  *Id.* at 184:5–7.  His photographs depicted the inside of the apartment and its contents, including a money counter.  *Id.* at 186:23–188:9.

Day two's last witness was Federal Bureau of Investigation DNA Examiner Kelsey Ruddick. *Id.* at 223:5–8. She testified as "an expert in the field of forensic DNA analysis." *Id.* at 227:12–16.

Day Three

Ms. Ruddick's testimony continued the next day. She analyzed the DNA swabs from the Micro Draco and magazine. Mar. 12 Trial Tr., ECF No. 113, at 4:24–5:3. As for the Micro Draco, Ms. Ruddick reported that the sample contained DNA from five or more individuals and thus was unsuited for further analysis. *Id.* at 5:21–24. The same was not true for the magazine, whose sample contained DNA from two individuals and provided "limited support for inclusion of Mr. Martin." *Id.* at 7:1–12.

Metropolitan Police Officer Elthson Torres was next. *Id.* at 65:5–8. Officer Torres helped collect evidence from the apartment. *Id.* at 67:9–12. Among other things, he seized roughly $12,000 in U.S. currency from a washing machine, ammunition, magazines, a scale, blue pills, and white powder. *Id.* at 71:20–82:18. The Government also presented the jury with Officer Torres's body-worn camera footage showing him seizing the various items from the apartment. *Id.* at 72:5–74:5.

Apart from Officer Schemmel (whom the Court will discuss later), the other two witnesses that day were Bureau of Alcohol, Tobacco, Firearms, and Explosives Research Specialist Jillian Ganley, *id.* at 136:20–137:1, and Secret Service Analyst Sergio Ramirez, *id.* at 199:1–11. An expert in "historical cell site location information," *id.* at 140:13–16, Ms. Ganley analyzed cell site data associated with Martin's phone number during the three-week period before Martin's arrest, *id.* at 149:23–150:10. Over that time range, Ms. Ganley found that Martin's phone connected with cell towers near the apartment where he was arrested roughly 700

4

times between 2:00 a.m. and 6:00 a.m.  *Id.* at 159:24–160:15.  Mr. Ramirez, in turn, testified to the data extraction he performed on Martin's phone.  *Id.* at 202:9–207:1.

Day Four

One bit of context before addressing day four.  Before trial, the Government moved to introduce various pieces of "other crimes" evidence under Federal Rule of Evidence 404(b).  *See* Gov't Notice of Intent, ECF No. 28, at 1.  At the pretrial conference, the Court ruled that some of that evidence would be admissible: (1) an Instagram Live video showing an individual holding a firearm, (2) evidence extracted from Martin's phone relating to the dealing and preparation of illegal drugs, as well as two photographs of firearms, (3) a video showing an individual at a recording studio next to a firearm, and (4) evidence relating to Martin purchasing a commercial pill press from China.  Pretrial Conf. Tr., ECF No. 58, at 177:20–184:11.

Drug Enforcement Administration Special Agent Jason Gartsu testified on the fourth tranche of Rule 404(b) evidence.  Mar. 16 Trial Tr., ECF No. 114, at 52:4–7.  Agent Gartsu investigated Martin for purchasing a pill press from China.  *Id.* at 55:18–22.  He recounted that he intercepted the pill press at another address associated with Martin, put a covert tracker on it, and prepared a controlled delivery.  *Id.* at 59:8–60:9.  Agent Gartsu also testified to video footage that purportedly showed Martin picking up the pill press in a car.  *Id.* at 105:7–11.

The rest of day four was taken up by Metropolitan Police Detective Brian McCarthy.  *Id.* at 149:19–22.  Detective McCarthy testified that he was familiar with "Draco-style" firearms, including Micro Dracos.  *Id.* at 151:19–152:5.  He described Micro Dracos as "one of the more uncommon firearms."  *Id.* at 152:21–23.  Detective McCarthy then discussed various pieces of digital evidence that he had reviewed—including a video from a recording studio apparently showing Martin sitting next to a Micro Draco and holding a bundle of cash.  *Id.* at 162:4–166:13.

According to Detective McCarthy, one could tell that the firearm in the video was a Micro Draco due to "the wood grain foregrip, which [wa]s similar to the one for the firearm at issue in this case." *Id.* at 167:13–20.

Day Five

Detective McCarthy resumed his testimony on the last day of trial. He focused on two photographs extracted from Martin's phone, each of which depicted a Micro Draco. Mar. 17 Trial Tr., ECF No. 115, at 17:5–11. The first showed U.S. currency, "suspected marijuana" inside a plastic bag, and a Micro Draco inside the apartment in which Martin was arrested. *Id.* at 17:25–18:9. The second was a still image from a video showing "what appear[ed] to be [a] Micro Draco." *Id.* at 20:3–9. Detective McCarthy further testified about evidence from Martin's phone "regarding the potential sale or distribution or possession of fentanyl or blue M30 pills"— including messages discussing the sale of "blues," instructions for making crack cocaine, and the purchase of a pill press from China. *Id.* at 23:9–62:8. The blue M30 pills were consistent with having come from the pill press. *See id.* at 45:4–6.

The Government's last witness was FBI Task Force Officer James Walsh. *Id.* at 115:17–116:3. An expert on drug distribution and pricing, *id.* at 124:5–20, Officer Walsh opined that the number of recovered carfentanil pills and the amount of cocaine were consistent with drug distribution, and so were the Micro Draco, scale, packaging, U.S. currency, and money counter. *Id.* at 126:15–143:16.

\* \* \*

Now rewind to Officer Schemmel's testimony on day three. Officer Schemmel focused on authenticating one piece of Rule 404(b) evidence: the Instagram Live video that he had recorded as part of an investigation into a group suspected of illegal gun possession. *See* Mar. 12

Trial Tr. at 114:8–12, 118:3–4. The video showed a man holding a Micro Draco. *See id*. at 118:7–119:3, 119:20–24. Officer Schemmel did not identify the man holding the Micro Draco. *Id.* at 120:12–14. On cross-examination, when defense counsel had Martin stand up and asked whether the man in the video was Martin, Officer Schemmel repeated that he did not know. *Id.* at 130:23–131:9. The defense also inquired about five other individuals in the video, but Officer Schemmel identified only one of them, "the rapper Situation Slim." *Id.* at 129:19–130:22. Situation Slim had no other role in the case. Ultimately, Officer Schemmel described his involvement in the investigation as confined to "notify[ing] a detective" once he found this video online. *Id.* at 120:16–20. He explained that his role ended after sharing the video with Detective McCarthy. *Id.* at 120:21–121:5.

On top of his other testimony, Detective McCarthy identified Martin in the Instagram Live video that Officer Schemmel had shared with him. Mar. 17 Trial Tr. at 63:3–21. On cross-examination, Detective McCarthy agreed with the defense that the video showed "Mr. Martin reach[ing] behind the machine and pull[ing] out a Draco." *Id.* at 71:7–9. Like with Officer Schemmel, defense counsel asked Detective McCarthy about the five other individuals in the video, and he identified all of them. *Id.* at 68:25–72:7. Upon the defense's questioning, Detective McCarthy stated that the video depicted Martin handing the Micro Draco to a man named Bob. *Id.* at 71:7–11. As recounted above, Detective McCarthy also identified a Micro Draco in two photographs extracted from Martin's phone, *see id.* at 17:5–11, 17:22–18:9, 19:25–20:9, and identified Martin as sitting next to a Micro Draco in the video from the recording studio, *see* Mar. 16 Trial Tr. at 165:20–167:2.

The defense did not call any witnesses. *See* Def. Ex. List, ECF No. 95, at 1–13.

7

In sum, the Government's evidence showed that someone who looked like Martin dropped a backpack containing a Micro Draco, carfentanil pills, and cocaine from an apartment window after the police showed up to arrest Martin; that Martin and his girlfriend were the sole adult occupants of that apartment at the time; that the apartment contained a cornucopia of cash, drugs, and firearms-related contraband; that Martin regularly spent the night there; that Martin texted various individuals about the sale of carfentanil pills and the preparation of crack cocaine; that Martin previously sat next to a Micro Draco while holding bundles of cash in a recording studio; that Martin had images of a Micro Draco on his phone; and that Martin texted a Chinese number to buy a commercial pill press and picked up that pill press in a car. In that presentation, Officer Schemmel's role was to introduce an Instagram Live video showing Martin holding a Micro Draco, though only Detective McCarthy—not Officer Schemmel—identified Martin in his later testimony on the same video.

The Government's closing recapped the same evidentiary aperçu. It started with Sergeant Smith, emphasizing both his testimony of seeing Martin drop the backpack out of the apartment window and his contemporaneous radio transmissions. Mar. 17 Trial Tr. at 194:10–195:17. The Government then turned to the evidence from Martin's phone, in particular "the picture of the Micro Draco on a gray couch, marijuana on top of it and surrounded by cash." *Id.* at 197:15–21. That was the same firearm as the one recovered, the Government argued, because it had "the same wooden grip at the front" and "the same magazine with the ridges along it." *Id.* at 197:24–198:4.

In one sentence, the Government then addressed the Instagram Live video of Martin holding a Micro Draco. *Id.* at 198:21–24. The prosecutor did not mention Officer Schemmel in connection with the video or in any other part of its closing. *See id.* at 193:16–211:4. After

8

covering the Instagram Live video, the Government moved to the "video from a music studio in which Derrick Martin is sitting next to a Micro Draco, a Micro Draco that looks identical to the one that was recovered in this case, a Micro Draco that has a similar wood grain on the grip as the one that Detective McCarthy described being recovered in this case." *Id.* at 199:1–6. The Government then pointed to the "photographs in Derrick Martin's phone with blue M30 pills," which "appear[ed] to be similar to those that were recovered," *id.* at 199:24–200:3, as well as the numerous text messages negotiating apparent drug deals, *id.* at 200:14–202:8.

The Government later discussed what it called the "tools of the trade in Derrick Martin's apartment," *id.* at 207:6–7, including the pill press Martin purchased from China and picked up from another apartment building, *id.* at 202:9–207:2, as well as the scale and money counter, *id.* at 207:8–9. Finally, the Government reminded the jury of the expert evidence, including Ms. Ruddick's DNA analysis indicating limited support for Martin's DNA on the recovered magazine, *id.* at 207:14–208:9, as well as Ms. Ganley's cell site location analysis showing Martin's frequent presence around the apartment where he was arrested, *id.* at 209:6–14.

Then came the defense, which attempted to poke several holes in the Government's case. The defense contended that there was "no identification that Mr. Martin [wa]s the person who dropped the backpack out of whatever window it dropped from." *Id.* at 215:21–23. Martin's lawyer challenged Sergeant Smith's eyewitness account, asserting that "he didn't see who dropped the backpack." *Id.* at 216:1–2. On the same theme, the defense maintained that the Government had provided no video evidence from the apartment building showing Martin with the backpack. *Id.* at 226:4–10. As to the various items recovered from the apartment, the defense insisted that "the Government present[ed] no evidence connecting the items inside Juanneshia Payne's apartment to Mr. Martin." *Id.* at 230:1–5. Martin's lawyer then addressed

9

some of the Rule 404(b) evidence, including the Instagram Live video.  Mar. 18 Trial Tr., ECF No. 122, at 14:8.  The defense mentioned that Officer Schemmel had "watched" the video but did not further discuss him or his testimony.  *Id.* at 14:8–11.  Instead, the defense "acknowledge[d] [that] Mr. Martin touched, for like a second and a half, a Micro Draco in that Instagram video," but then emphasized that Martin "hand[ed] it to Bob."  *Id.* at 14:14–21.  As for the Rule 404(b) evidence more broadly, Martin's lawyer underlined that the jury could not convict him for "acts other than those charged in the indictment."  *Id.* at 17:10–12.

After less than a full day of deliberation, the jury convicted Martin of all four counts. Min. Entry 3/18/2026; Mar. 18 Trial Tr. at 56:10–58:14.

**B.**

At a hearing six weeks after trial, the Government made two disclosures.  *First*, the Government told the Court that it had shortly before "learned for the first time that, on March 9, 2026, D.C. Superior Court Judge Errol R. Arthur, in *United States v. Carrington Williams*[,] [2025 CF2 016157], made a credibility finding against Officer Schemmel following a suppression hearing."  Notice of Disclosure, ECF No. 109, at 2.  In granting the defendant's motion to suppress in that case, Judge Arthur did not "credit" Officer Schemmel's testimony that "the purpose of [his] interaction" with the defendant was to "conduct a wellness check" or to "inform [the defendant] to be on the lookout for suspected carjackers."  Suppression Hr'g Tr., *United States v. Carrington Williams*, ECF No. 109-1, at 99:22–100:4.  The judge was also skeptical of Officer Schemmel's account that he smelled burnt marijuana and that he saw a "square object in the [defendant's] groin area," finding that "the body camera footage contradict[ed] or counter[ed] specific and very important areas of Officer Schemmel's testimony and his observations."  *Id.* at 102:7–103:6.

*Second*, the Government disclosed "that, on November 26, 2024, D.C. Superior Court Judge Judith E. Pipe, in *United States v. Rinardo Russell*[,] [2024 CF2 002732], did not credit a hearsay statement attributed to Officer Schemmel during a suppression hearing."  Notice of Disclosure at 3 (footnote omitted).  In that hearing, another officer testified that "Officer Schemmel [had] told [him] that he saw the L outline of a firearm in [the defendant's] coat pocket."  Suppression Hr'g Tr., *United States v. Rinardo Russell*, ECF No. 109-2, at 3:19–22. Given that "[t]he Government did not call Officer Schemmel at the hearing" or "elicit any testimony from [the other officer] about how or when Officer Schemmel saw this L-shaped object," Judge Pipe did not "credit that Officer Schemmel saw an L shape prior to [the defendant] running."  *Id.* at 4:21–5:13.

Based on these two disclosures, Martin moves for a new trial under *Brady*.  Mot. for New Trial, ECF No. 117, at 1–10.  Because Martin fails to establish a *Brady* violation, the Court denies his motion.

## II.

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  If the prosecution infringes *Brady*, that authorization becomes a mandate.  *See United States v. Oruche*, 484 F.3d 590, 595 (D.C. Cir. 2007) ("[O]nce a court finds a *Brady* violation, a new trial follows as the prescribed remedy, not as a matter of discretion.").[1]

---

[1]  The Government initially invokes the legal standard for Rule 33 motions "based on newly discovered evidence," arguing that the *Thompson* factors apply.  *See* Notice of Disclosure at 24 (citing *Thompson v. United States*, 188 F.2d 652, 653 (D.C. Cir. 1951)).  "The *Thompson* test does not, however, govern motions for a new trial when the newly-discovered evidence indicates that the original trial was marred by a sixth amendment or *Brady* violation."  *United States v. Kelly*, 790 F.2d 130, 133 (D.C. Cir. 1986).  The Government correctly concedes as much in its reply.  *See* Reply, ECF No. 120, at 1–2.

"There are three components of a true *Brady* violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  Those prongs "must be assessed count by count."  *United States v. Johnson*, 592 F.3d 164, 171 (D.C. Cir. 2010).

Prong three, also known as "materiality," is often "the most difficult" to establish.  *See Strickler*, 527 U.S. at 282 (cleaned up).  "[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Kyles v. Whitley*, 514 U.S. 419, 433 (1995).  "Reasonable probability is lower than a preponderance standard, but demanding enough that the suppression 'undermine[s] confidence in the outcome of the trial.'"  *United States v. Bagcho*, 151 F. Supp. 3d 60, 67–68 (D.D.C. 2015) (quoting *United States v. Bowie*, 198 F.3d 905, 908 (D.C. Cir. 1999)), *aff'd*, 923 F.3d 1131 (D.C. Cir. 2019).

### III.

The Government concedes that Martin satisfies *Brady*'s first two prongs.  *See* Reply, ECF No. 120, at 2.  Rightly so.  After all, the transcripts from the two Superior Court hearings are "favorable to" Martin because they are "impeaching."  *See Strickler*, 527 U.S. at 281–82; *see also Bowie*, 198 F.3d at 908 ("Evidence affecting the credibility of government witnesses is a category of exculpatory information potentially within *Brady*'s disclosure obligation." (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)).  And because both hearings occurred before

12

Martin's trial, the Government "suppressed" the transcripts, regardless of any claimed "inadverten[ce]." *See Strickler*, 527 U.S. at 282.[2]

Where Martin falters, though, is on prong three—materiality. In short, he fails to establish "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *See Kyles*, 514 U.S. at 433.

*Bowie* is instructive. The defendant there moved for a new trial because the prosecution failed to disclose that one of its witnesses, Officer Moses, "was under investigation by the United States Attorney's Office regarding his testimony" in a separate suppression hearing in which the judge had found "the defense witnesses more credible than Moses." *Bowie*, 198 F.3d at 907.

The D.C. Circuit rejected the defendant's bid for a new trial because its "confidence in [the defendant's] conviction [wa]s not shaken by the government's post-trial revelation." *Id.* at 909. As the court emphasized, another witness, Officer Riggins, had "testified to precisely the same events as Moses and, in all important respects, agreed with him." *Id.* at 911. Thus, "even if the most effective cross-examination had convinced the jury that Moses was not to be trusted, the unimpeached testimony of [O]fficer Riggins would [have] remain[ed] to bolster Moses and to convince" the jury "beyond any reasonable doubt that [the defendant] possessed the pistol and that he attacked the two officers." *Id.* at 912. Considering that other testimony, the suppressed impeachment evidence proved immaterial. *See id.*

---

[2] The Government's lengthy explanation, *see* Notice of Disclosure at 3 n.1, does not excuse its late disclosure of the two transcripts, whatever their materiality. *See United States v. Naegele*, 468 F. Supp. 2d 150, 153 (D.D.C. 2007) ("[T]he duty to disclose evidence favorable to the accused pretrial (and during trial) applies without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial." (cleaned up)). The Court is troubled that it took the Government almost two months to learn of Judge Arthur's credibility finding.

A wealth of caselaw from the Supreme Court and federal appellate courts tells a similar tale—if undisclosed *Brady* evidence relates to a minor or largely cumulative witness, a new trial is not required. *See, e.g.*, *Strickler*, 527 U.S. at 293–96 (holding that impeachment evidence against eyewitness was immaterial under *Brady* because "[t]he record provide[d] strong support for the conclusion that petitioner would have been convicted of capital murder and sentenced to death, even if [the eyewitness] had been severely impeached"); *Oruche*, 484 F.3d at 599 (deeming immaterial "grand jury testimony in which [the witness] admitted she had lied to police" because "the evidence corroborating [the witness's] testimony on counts one, two, and three was very strong"); *United States v. Zhang*, 135 F.4th 44, 53 (2d Cir. 2025) (ruling that impeachment evidence was immaterial where the relevant witness's "testimony was reinforced by a wealth of incriminating text messages from before and after the murder, phone records, surveillance video footage, and testimony from two co-conspirators"); *Barker v. Fleming*, 423 F.3d 1085, 1100–01 (9th Cir. 2005) (same where the prosecutor "devoted only a small portion of his argument to" the relevant witness's testimony, and the witness "was not the glue holding together the prosecution's case"). So too here.

In reaching its holding in *Bowie*, the D.C. Circuit distinguished *United States v. Cuffie*, 80 F.3d 514 (D.C. Cir. 1996). *See Bowie*, 198 F.3d at 911. In that case, "[t]he government [ha]d not inform[ed] [the defendant] that a key witness against him at trial, Ronald F. Moore, had perjured himself in another judicial proceeding." *Cuffie*, 80 F.3d at 515. In the panel's eyes, that suppressed information was material to the trial's outcome. *Id.* For one part, the court reasoned that perjury "in a previous court proceeding involving the same drug conspiracy identified an infirmity in Moore's testimony that is almost unique in its detrimental effect on a witness'[s] credibility." *Id.* at 518. For another, the panel underlined that Moore's testimony "established

14

the only direct connection between [the defendant] and the drugs found during the search of Moore's apartment." *Id.* Taken together, these concerns established "a reasonable probability that the verdict would have been different if [the defendant] had been able to use the undisclosed evidence to impeach Moore at trial." *Id.* at 515; *see also Smith v. Cain*, 565 U.S. 73, 76 (2012) (holding that impeachment evidence was material where the relevant eyewitness's "testimony was the *only* evidence linking [the defendant] to the crime" and the "undisclosed statements directly contradict[ed] his testimony").

This case falls on *Bowie*'s side of the line—and by a healthy margin.

At the outset, the Court assumes that it would have allowed the defense to cross-examine Officer Schemmel with his testimony from the *Williams* suppression hearing. Judge Arthur's credibility finding, though far from proving that Officer Schemmel perjured himself, could have enabled the defense to probe into Officer Schemmel's "character for truthfulness or untruthfulness." *See* Fed. R. Evid. 608(b)(1).

That assumption does not, however, extend to the testimony from the *Russell* hearing. The Court "enjoys broad discretion to control cross-examination." *United States v. Hite*, 769 F.3d 1154, 1171 (D.C. Cir. 2014). "It may disallow cross-examination that is repetitive, irrelevant, unduly prejudicial, collateral to the issues in the trial, or outside the scope of direct examination." *Id.* Officer Schemmel did not testify before Judge Pipe at the *Russell* hearing; her credibility evaluation targeted a hearsay statement that another officer ascribed to Officer Schemmel. But the testifying officer may simply have misunderstood, misremembered, or misstated Officer Schemmel's earlier unsworn statements to him. The Court thus would have concluded that cross-examination based on the *Russell* hearing would have been "irrelevant,"

15

confusing, and "unduly prejudicial." *See id.* It also would have been "repetitive" if preceded by questioning about the *Williams* hearing. *See id.*

Even though the *Williams* credibility finding could have provided fodder for cross-examination, its suppression does not "undermine [the Court's] confidence in the outcome" on any of the four counts. *See Bowie*, 198 F.3d at 908. That conclusion flows both from the nature of Officer Schemmel's testimony and the broader evidence at trial.

Officer Schemmel's role was minimal. He testified not to the events charged in the indictment but only to Rule 404(b) evidence. His chief function was to introduce one sliver of that evidence: the Instagram Live video he recorded. Officer Schemmel's testimony on this score was cumulative of and corroborated by other evidence—most notably Detective McCarthy's testimony identifying Martin as holding a Micro Draco in the same video, as well as Detective McCarthy's testimony about the two photographs of a Micro Draco and the video showing Martin sitting next to a Micro Draco in a recording studio. (And recall that Officer Schemmel had nothing to do with this other damning evidence against Martin). In contrast to Detective McCarthy, Officer Schemmel could not identify Martin in the video, which helped the defense more than it hurt. Given all this, it is unsurprising that the defense chose not to cross-examine him based on the impeachment material that the Court permitted. *See* Mar. 12 Trial Tr. at 126:11–136:4. And both parties' closing arguments, neither of which relied on Officer Schemmel's testimony, only hammer home its insignificance. As recounted above, defense counsel mentioned the Instagram Live video only in passing, minimizing its significance rather than disputing any of Officer Schmemmel's testimony.

Officer Schemmel's unimportance to the outcome becomes even clearer against the wealth of other evidence. To highlight a few examples, consider Sergeant Smith's account of

16

seeing Martin drop the firearm- and narcotics-laden backpack from the apartment window; Officer Torres's recovery of blue pills, white powder, ammunition, magazines, a scale, and $12,000 in cash from a washing machine in the apartment Martin was in; Ms. Ganley's cell site location analysis showing Martin frequented that apartment; Agent Gartsu's description of Martin's efforts to buy a pill press from China, including video footage of Martin picking up the pill press; and Detective McCarthy's other testimony describing Micro Dracos and the messages from Martin's phone discussing the sale of carfentanil pills and instructions for making crack cocaine.  Officer Shemmel's testimony touched none of this.

In short, the Court holds that the undisclosed impeachment evidence against Officer Schemmel was not material to the outcome on the gun charges (Counts I and IV).  If anything, this case is more lopsided than *Bowie* or *Oruche* because Detective McCarthy not only corroborated but expanded on Officer Schemmel's testimony.  Officer Schemmel's limited testimony on one video is a far cry from the testimony of the essential witness who had previously perjured himself in *Cuffie* or the sole eyewitness in *Smith*.  In the end, the Court sees no "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *See Kyles*, 514 U.S. at 433.  And because Officer Schemmel's testimony had little or nothing to do with the drug charges, that conclusion holds only more firmly for Counts II and III.  For all four counts, then, Martin's *Brady* claim lacks the essential ingredient of materiality.  Without that element, a new trial is unwarranted.

**IV.**

For all these reasons, it is hereby

**ORDERED** that Defendant's [117] Motion for a New Trial is **DENIED**.

Dated: July 21, 2026

_____
TREVOR N. McFADDEN, U.S.D.J.